# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

DENNIS LEROY MAESTAS,

       Plaintiff,

v.                                                          CV 13-1110 WPL

CAROLYN W. COLVIN, *Acting Commissioner of the Social Security Administration*,

       Defendant.

## MEMORANDUM OPINION AND ORDER

Dennis Maestas applied for disability insurance benefits and supplemental security income on June 24, 2010, based on type II diabetes mellitus ("diabetes"), hypertension, and anemia. (Administrative Record ("AR") 119-29.) After his applications were denied at all administrative levels, he brought this proceeding for judicial review. The case is before me now on Maestas's Motion to Reverse and Remand for Rehearing, a response filed by the Commissioner of the Social Security Administration ("SSA"), and Maestas's reply. (Docs. 21-23.) For the reasons explained below, I deny Maestas's motion to remand and dismiss this case with prejudice.

## STANDARD OF REVIEW

When the Appeals Council denies a claimant's request for review, the Administrative Law Judge's ("ALJ") decision is the SSA's final decision. In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir.

2012). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that he has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520, 416.920. If a finding of disability or nondisability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the claimant must show (1) that he is not performing a substantial gainful activity; (2) that he has an impairment severe enough to significantly limit his ability to do basic work activities; and (3) that his impairment or impairments, individually or in the aggregate, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

If the claimant does not satisfy the third prong, the ALJ must determine the claimant's residual functional capacity ("RFC"), or the most that he is able to do despite his limitations. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). An RFC assessment requires two steps: first, determining

whether there is an underlying medically determinable physical or mental impairment or impairments that could reasonably be expected to produce the pain or symptoms; and second, evaluating the intensity, persistence, and limiting effects of all medically determinable impairments to determine the extent to which they limit the claimant's functioning. *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013). In cases where symptoms such as pain are alleged, the RFC determination must be supported by a thorough discussion and analysis of the objective medical evidence and other evidence, including the individual's complaints; resolve any inconsistencies in the evidence as a whole; and set forth a logical explanation of the effects of the symptoms on the individual's ability to work. Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7 (July 2, 1996); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).[1] Credibility determinations on a claimant's report of symptoms must contain specific reasons for the finding on credibility and be sufficiently specific to make clear to the individual or subsequent reviewers what weight the ALJ gave to the individual's statements and the reasons for that weight. SSR 96-7p, 1996 WL 374186, at *4-5.

At step four, the claimant must prove that, based on his RFC, he is unable to perform the work he has done in the past. *See Thomas*, 540 U.S. at 25; 20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv). At the fifth step, the burden shifts to the Commissioner to show that the claimant is capable, based on his vocational factors, of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25.

---

[1] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

**FACTUAL BACKGROUND**

Maestas is a sixty-three-year-old man with a high school education. (AR 157.) He previously worked as a restaurant manager, cook, salad maker, and deli rover. (AR 158.) He most recently was a cook at a Chili's restaurant, from November 2006 through August 11, 2010. (AR 158, 185.) Maestas claims disability beginning on June 1, 2010, based on diabetes, hypertension, and anemia. (AR 119, 126.) He complains particularly of blurry vision, fatigue, and difficulty standing.

Maestas has a sparse medical record for his numerous physical ailments. Maestas requested records from Kaiser Permanente, which confirmed that he had been a Kaiser patient, but had not been seen since 2003. (AR 259.) Maestas also claimed that he was a patient at El Centro Family Health, but El Centro returned the request for medical records with a note that Maestas had never been treated there. (AR 263.)

Maestas's earliest submitted documents come from Pojoaque Primary Care, St. Vincent Regional ("PPC"), dated September 10, 2009. (AR 224.) Jennifer Chin, M.D., treated Maestas at a follow-up visit for a severe rash, described as "erythematous and itchy," and five chronic health issues: heartburn, hyperlipidemia, organic impotence, uncontrolled diabetes, and hypertension. (*Id.*) He did not complain of vision loss or fatigue, and Dr. Chin noted normal findings on his systems review. (AR 225.) At that time, Maestas was taking benazepril, triamcinolone acetonide, SureStep, Norvasc, and Viagra. (*Id.*)

Maestas returned to PPC on December 24, 2009, and reported that he spent two days in the hospital in Espanola, New Mexico, after feeling "dizzy" at work and being transported by ambulance. (AR 227.) Maestes told Dr. Chin that anemia necessitated his hospitalization. (*Id.*) He did not present records of this treatment to Dr. Chin or during the pendency of his

applications. Dr. Chin found that medication had stabilized Maestas's hyperlipidemia and controlled his hypertension, though his diabetes remained uncontrolled. (AR 229.)

The next record comes from PPC on June 14, 2010, when Maestas went to the doctor after missing two weeks of work. (AR 231.) James Delgado, M.D., wrote a letter stating that Maestas had been under Dr. Delgado's care and could return to work on June 15, 2010. (AR 230.) Maestas's systems review was asymptomatic, and he did not complain of vision loss or fatigue. (AR 232.) On June 18, 2010, Dr. Delgado diagnosed Maestas with severe anemia and ordered an upper endoscopy and colonoscopy. (AR 255.)

Maestas checked in at Presbyterian Hospital on June 21, 2010, and had a pre-operative radiology consultation. (AR 256.) The radiologist found "[n]o acute disease[; and s]mall areas of pleural thickening or plaque formation consistent with extrapleural fat or possibly asbestos related pleural disease." (AR 256.) Miguel Iturregui, M.D., performed the upper endoscopy and colonoscopy on June 22, 2010. (AR 257.) Dr. Iturregui diagnosed Maestas with iron deficiency anemia, but otherwise made no remarkable findings. (*Id.*)

Dr. Delgado wrote Maestas another medical excuse on July 2, 2010, and stated that Maestas could return to work on July 6, 2010. (AR 234.) At the July 2 office visit, Dr. Delgado diagnosed Maestas with gout, indicated by acute onset edema in his right great toe that started approximately five days before the office visit. (AR 235, 237.) Maestas rated his pain as an eight out of ten. (AR 236.) Maestas did not complain of vision loss, but did complain of fatigue for approximately two months prior. (*Id.*)

SSA Representative E. Brewer interviewed Maestas at the state agency field office on July 17, 2010. (AR 154-55.) Brewer observed Maestas to have slow responses and mannerisms, and noted that he "seemed fatigued." (AR 154.) Maestas filled out a disability report on the same

day, complaining of diabetes, high blood pressure, and anemia. (AR 157.) He reported that his symptoms caused changes in his work activity beginning on June 1, 2010. (AR 157.) Maestas listed his medications as amlodipine, benazepril, glipizide, hydrochlorothiazide, metformin, SureStep, and triamcinolone acetonide. (AR 160.)

In a Function Report dated July 27, 2010, Maestas reported wearing prescription glasses since 1998, and stated that he wears them all the time. (AR 175.) Maestas stated that he has a driver's license, but does not drive at night because his "vision changes daily." (AR 172-73.) He stated that his daily routine included eating breakfast, going for a walk if he was not working, and taking medications morning and night. (AR 169.) Maestas claimed that he could walk only two or three blocks before needing a half hour rest, and he asserted that his illnesses affect his lifting, squatting, bending, standing, reaching, walking, kneeling, talking, stair climbing, seeing, and instruction-following capabilities. (AR 174.)

Craig Billinghurst, M.D., non-examining state agency medical consultant, created a Case Analysis report for Maestas's case on September 13, 2010. (AR 262.) Dr. Billinghurst concluded that Maestas suffered from gout, though it was not initially a claimed impairment, and that his other conditions were stabilized or improved with medication and not affecting other body systems. (*Id.*) Dr. Billinghurst stated that he thought Maestas was "not too credible" because his symptoms would not impact Maestas's allegedly impaired capabilities. (*Id.*) In support of this, Dr. Billinghurst pointed out that Maestas complained of leg and back pain, but noted that the musculoskeletal exams were "negative for any bone/joint symptoms and weakness." (*Id.*) Furthermore, Dr. Billinghurst questioned Maestas's credibility because he does not appear to have mentioned any of these symptoms to his treating doctors. (*Id.*) Dr. Billinghurst concluded that Maestas did not suffer from a severe physical impairment. (*Id.*)

6

SSA Representative T. Garcia conducted a face-to-face interview with Maestas at the state agency field office on November 10, 2010. (AR 187.) Garcia noted that Maestas exhibited difficulty reading, walking, and standing. (*Id.*) Garcia wrote that Maestas's hands appeared swollen, that he walked with caution "as if he was hurting," and that he asked for help completing the forms because he had a hard time reading them. (*Id.*) Maestas submitted a Vision Screening Report on November 24, 2010, and reported that he cannot read small print, newspapers, or computer screens. (AR 196.) He stated that his vision fluctuates fairly regularly, though not every day, and he is unable to drive at night. (*Id.*)

Maestas went to PPC for an office visit and update on lab results on December 22, 2010. (AR 268.) He reported to Dr. Delgado that he was not experiencing any blurry vision or fatigue. (AR 268-69.) Dr. Delgado referred Maestas for an annual eye exam because of his diabetes. (AR 270.)

N.D. Nickerson, M.D., non-examining state agency medical consultant, conducted a second Case Analysis during the reconsideration phase of Maestas's applications. (AR 273.) Dr. Nickerson agreed that Maestas's diabetes and hypertension were stabilized with treatment. (*Id.*) She noted Maestas's claim of vision fluctuation, but also noted that he consistently reported to Drs. Delgado and Chin that he was experiencing no blurry vision or vision loss. (*Id.*) Dr. Nickerson concluded that Maestas's condition had not significantly changed or declined since the Case Analysis of September 13, 2010, and concluded that Maestas did not suffer from any severe physical limitations. (*Id.*)

Maestas returned to PPC for an office visit with Dr. Delgado on May 4, 2011. (AR 279.) They discussed Maestas's medications and his need for a letter to the disability agency indicating his medical history and conditions. (*Id.*) Maestas exhibited edema in his ankles that started

approximately one month prior to the visit. (*Id.*) He again did not report any blurred vision, vision loss, or fatigue. (AR 279-80.)

Dr. Delgado submitted a letter, dated May 19, 2011, indicating that Maestas had been a patient at PPC for at least five years. (AR 274.) Dr. Delgado further informed the agency that Maestas suffers from diabetes, hypertension, hyperlipidemia, and gastroesophageal reflux disease; further, Maestas donated a kidney in the past and has been hospitalized for renal failure and severe anemia. (*Id.*)

### HEARING TESTIMONY

The ALJ held a hearing on March 20, 2012, at which Maestas and a vocational expert ("VE") testified. (AR 34-57.) The ALJ informed Maestas of his right to have representation, and Maestas elected to represent himself and proceed with the hearing. (AR 35-37.) Maestas appeared by videoconference. (AR 38.)

Maestas alleged several physical impairments that prevent him from working. Maestas testified that he wears glasses, but continues to have daily vision fluctuations due to his diabetes. (AR 40.) He said that his vision gets blurry when his glucose levels are high, and he has difficulty maintaining his glucose levels. (AR 46.) Most of Maestas's vision issues are with up-close work. (AR 47.) His last eye exam was seven months before the hearing, and while he has a driver's license, he had a friend drive him to the hearing because he struggles with blurry vision. (AR 39, 46.) Maestas also testified that his legs and feet swell because of the diabetes. (AR 47.) He stated that he was previously diagnosed with gout, and that sometimes his feet are so swollen that he cannot put on shoes. (*Id.*) He reiterated that he has difficulty controlling his glucose levels. (*Id.*) Finally, Maestas testified that he gets headaches and dizzy spells from high blood pressure. (AR 48.)

He stated that he lives in a house with a friend, and that the friend frequently comes home from work to prepare lunch for Maestas, because Maestas is afraid of injuring himself. (AR 48-49.) He recently started a new diabetes medication, called Janumet. (AR 41.) Maestas testified that, on a typical day, he starts by taking medication. (AR 49.) Maestas said that he walks for at least an hour every day, per doctor's orders, but that he sometimes struggles getting out of bed and taking care of his personal hygiene. (AR 50.) He also watches television for five to six hours each day. (*Id.*)

Maestas testified that he completed high school and has no additional vocational training. (AR 40.) Maestas stated that he has six or seven years of restaurant-management experience. (AR 54.) He said that he stopped working on May 20, 2010, evidenced by a letter from Brinker International, which is the parent company for Chili's. (AR 40.) Maestas testified that he took a medical leave of absence from Brinker before being terminated, and then he went to the state unemployment office. (AR 43.) He said that he drew unemployment benefits for two years, but the benefits ran out approximately three weeks before the hearing. (AR 44.) In accordance with unemployment regulations, Maestas certified that he was applying for jobs at restaurants and went to the Workforce Commission center to check their computer database of job listings. (AR 44-45.) Maestas said that his attempts at gaining employment were unsuccessful. (AR 44.) Maestas testified that, while he certified to the unemployment agency that he was available, willing, and able to work, he does not believe he would have been able to complete the tasks if someone offered him a job. (AR 45.) He said that he stopped looking for full-time work because his health would prevent him from doing his job: he is unable to read monitors, he cannot stand for extended periods, and the stress causes his glucose levels to go out of control. (AR 46, 51.)

After examining Maestas, and giving him an opportunity to supplement his testimony, the ALJ questioned the VE. (AR 53.) The ALJ informed the VE that the three relevant jobs in Maestas's work history are restaurant manager, cook, and deli rover. (AR 55.) Maestas's most recent job was as a cook at Chili's, which the VE classified as medium work with a skill level of seven. (*Id.*) The VE further testified that Maestas's position as a deli rover was medium work with a skill level of two; his position as a salad maker was light work with a skill level of four; and his position as a restaurant manager was light work with a skill level of seven. (AR 55-56.)

The ALJ then asked the VE if an individual with pain in various parts of his body, who missed work even one day, and this happened repeatedly, could work in the restaurant business. (AR 56.) The VE answered in the negative, stating that the food industry is fairly demanding, and no employer would tolerate such absences. (AR 56.)

## THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ issued his decision on June 8, 2012, and reviewed Maestas's applications according to the sequential evaluation process. (AR 22-23, 28.) At step one, the ALJ found that Maestas had not engaged in substantial gainful activity since the alleged onset date of June 1, 2010. (AR 23.) At the second step, the ALJ concluded that Maestas suffers from the severe impairments of diabetes, hypertension, anemia, and gout, and the nonsevere impairments of status post-renal failure and kidney removal. (*Id.*) At step three, the ALJ found that Maestas did not have an impairment or combination of impairments equaling the severity of one of the listed impairments. (AR 24.)

As part of step four, the ALJ determined that Maestas has the RFC to perform the full range of work at the medium level. (*Id.*) The ALJ noted the two-step process for assessing a claimant's symptoms: 1) determining whether there is an underlying, medically determinable,

physical or mental impairment that could reasonably be expected to produce the symptoms; and 2) evaluating the intensity, persistence, and limiting effects of the symptoms to determine their impact on the claimant's RFC. (*Id.*)

In making this finding, the ALJ agreed that Maestas's medically determinable impairments could reasonably be expected to produce his alleged symptoms, and he found Maestas's subjective reports credible to the extent that they are consistent with the RFC. (AR 25.) The ALJ noted that Maestas was found to have chronic, uncontrolled diabetes and hypertension from 2009 through 2010. (*Id.*)  Maestas's physical exams in June, July, and December 2010 showed normal findings, except for a swollen toe in July 2010. (*Id.*) In 2010, Dr. Delgado opined that Maestas could return to work after a two-day medical absence. (AR 26.) In his letter dated May 19, 2011, Dr. Delgado indicated Maestas's conditions, but expressed no opinion concerning work limitations. (AR 25.) Further, although the ALJ indicated that he gave less weight to the opinions of Drs. Billinghurst and Nickerson, because they both concluded that Maestas suffered from no severe impairments and the record does not substantiate such a conclusion, the ALJ noted that both doctors concluded that Maestas's impairments would not cause severe functional limitations. (AR 26.) Finally, the ALJ stated, "In summary, the medical record is very brief and contains no indication that the claimant would be reduced to less than medium work activity." (AR 25.)

With regard to his finding that Maestas's subjective reports were credible only to the extent that they are consistent with the RFC, the ALJ stated that "the record does not support the claimant's allegations that he has difficulties with standing, kneeling, seeing, and concentrating (Hearing Testimony)." (AR 26.) In addition to the medical evidence discussed above, the ALJ noted that "[t]he fact that the claimant actively looked for employment during the alleged period

of disability, and until three weeks before his disability appeal hearing, is also damaging to the credibility of his allegations." (*Id.*) The ALJ concluded that Maestas's "actively seeking work indicates that he was able and willing to work during the period at issue, as required to draw unemployment benefits." (*Id.*)

The ALJ then found that Maestas was capable of performing his past relevant work. (*Id.*) The ALJ concluded that all of Maestas's past relevant work is classified as medium or light work, and Maestas is capable of performing those jobs as generally performed in the national economy. (AR 27.) As an alternative finding, at step five, the ALJ found that other jobs exist that Maestas can do. (*Id.*) Therefore, the ALJ concluded, a finding of not-disabled is directed based on Maestas's work history and profile and on his ability to do the full range of medium work. (AR 28.)

The Appeals Council disagreed with Maestas's reasons for appeal and did not review the ALJ's decision. (AR 1.) It did, however, consider supplemental evidence from Maestas's attorney and from Dr. Delgado, which became part of the record. (AR 5.)

### DISCUSSION

Maestas argues that he was been disabled since June 1, 2010. He makes two broad arguments in favor of reversal and remand. First, Maestas argues that the ALJ erred in evaluating his credibility by impermissibly relying on boilerplate language and failing to discuss significant probative evidence supporting Maestas's allegations or why the finding did not rely on such evidence. Second, Maestas argues that the ALJ erred in determining the RFC by failing to support the RFC with a proper narrative statement, rendering the decision unsupported by substantial evidence.

I.       **Credibility Analysis**

Maestas raises two points to argue that the ALJ erred in his evaluation of Maestas's credibility. First, he challenges the ALJ's credibility determination for impermissibly relying on boilerplate language and "preclude[ing] meaningful review." (Doc. 21 at 3.) Second, he argues that the ALJ did not consider the entire case record because the ALJ did not discuss significantly probative evidence.

a.  **Boilerplate Language**

Maestas argues that the ALJ's use of boilerplate language "precludes meaningful review." (*Id.*) In particular, Maestas objects to the following passage from the ALJ's decision:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment, as discussed within this decision.

(AR 25; Doc. 21 at 4.) While the Tenth Circuit agrees that pure boilerplate language in credibility determinations denies the reviewing court a meaningful opportunity to understand the decision, *Hardman v. Barnhart*, 362 F.3d 676, 679 (2004), the ALJ in this case did not rest his credibility determination on boilerplate alone (*see* AR 25-26). The ALJ's use of boilerplate language does not, in and of itself, cause the ALJ's decision to run afoul of the requirements for credibility determinations elucidated in SSR 96-7p or by the Tenth Circuit.

b.  **Consideration of the Entire Case Record**

Next, Maestas argues that the ALJ failed to consider the whole record when making his credibility determination. In support of this argument, Maestas argues that the ALJ failed to

13

discuss significant probative evidence, inappropriately considered Maestas's unemployment benefits, and drew inappropriate inferences from Dr. Delgado's 2011 letter.

When the objective medical evidence in a case does not, on its own, direct a determination of disability, the ALJ must consider the claimant's symptoms and credibility of his subjective reports, in light of the entire record. SSR 96-7p, 1996 WL 374186, at *3. A claimant's symptoms, including pain, will diminish his RFC "to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record." *Id.* at *2. "An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his . . . ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." *Id.* at *1. When assessing the credibility of an individual's statements about his symptoms, the ALJ must consider:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms . . . ; and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.*; *see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ is required to consider all of the evidence, but is not required to discuss every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). "Credibility

determinations are peculiarly the province of the finder of fact . . . and [should be upheld if they are] supported by substantial evidence." *Winfrey*, 92 F.3d at 1020.

Maestas alleges that the ALJ failed to consider the entire record because he "failed to evaluate portions of the record which contained evidence to suggest that Mr. Maestas' [sic] claims were credible." (Doc. 21 at 5.) In particular, the ALJ did not address two interviews Maestas had with SSA employees in July and November 2010 and did not fully discuss the Function Reports or the Vision Screening Report. These interviews occurred during field office reports in the original application process. In the July 2010 disability report, E. Brewer noted that Maestas had slow responses and mannerisms and that he seemed fatigued. (AR 154-55.) At the November 2010 disability report, T. Garcia noted that Maestas exhibited difficulty walking and standing, that his hands appeared swollen, and that he requested assistance filling out the forms because he had a hard time reading them. (AR 187-88.) Maestas is correct that the ALJ did not address these interviews, but this evidence neither comes from a medical professional nor is uncontroverted. Again, the ALJ is not required to discuss every piece of evidence, so long as it is clear that he considered the entire record. *See Clifton*, 79 F.3d at 1009. Here, the ALJ discussed Maestas's medical history, work history, hearing testimony, and disability application in particularity. The ALJ clearly considered the entire record, and his failure to specifically address these two observations does not form the basis for reversible error.

Additionally, Maestas argues that the ALJ failed to consider the entirety of his Function Reports and the Vision Screening Report when making the credibility determination. Maestas argues that the ALJ, essentially, cherry-picked information from the Function Reports and the Vision Screening Report, because the ALJ did not cite sections of those reports that supported

Maestas's complaints. For example, in the reports, Maestas stated the he experienced blurry vision and had difficulty reading small print or monitors, and the ALJ did not address this point.

Here, however, the ALJ discussed Maestas's interactions with his doctors and his hearing testimony. Rather than simply cherry picking information, the ALJ noted that he assessed decreased weight to the opinions of two non-examining consultants because their findings were not wholly consistent with the remainder of the record. (AR 25-26.) Furthermore, the ALJ contrasted Maestas's statements on the reports—namely, his experience of blurry vision hindering his ability to read small print or monitors—with his hearing testimony, where Maestas testified that he went to the Workforce Commission and used their computer monitors to search for full-time work. (AR 26.) Even though the ALJ did not discuss every piece of evidence, this failure does not constitute reversible error when the ALJ cited to substantial evidence to support his findings.

Maestas goes on to argue that the ALJ's consideration of Maestas's unemployment compensation and the inferences drawn from Dr. Delgado's letter were inappropriate for the credibility determination. This argument is curious given Maestas's correct recitation of the requirement that an ALJ consider the entire case record.

First, the ALJ noted that Maestas testified that he actively searched for a job for two years after his alleged onset date, but was unable to find employment because of the economy. (AR 26.) He further testified that he used the computer monitors at the Workforce Commission center to assist in this job search, which undercuts his assertion of vision troubles rendering him unable to read a computer monitor. (AR 25.) The ALJ additionally noted that Maestas certified that he was able and willing to work during the relevant period, in order to draw unemployment benefits. (AR 26.)

Seeking unemployment benefits is not necessarily inconsistent with claims of total disability. *See, e.g.*, *Giuliano v. Colvin*, 577 F. App'x 859, 863-64 (10th Cir. 2014) (unpublished) (citing *Carmickle v. Commissioner*, 533 F.3d 1155, 1161-62 (9th Cir. 2008)). Although the Tenth Circuit has not explicitly ruled on what effect receiving unemployment benefits should have on disability determinations, it stands to reason that the Tenth Circuit would follow the lead of other Circuits. The receipt of unemployment benefits can certainly undermine a claimant's alleged inability to work full-time. *Id.*; *Carmickle*, 533 F.3d at 1161-62; *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005); *Johnson v. Chater*, 108 F.3d 178, 180-81 (8th Cir. 1997). Of particular import when determining the effect of unemployment benefits on a disability claim is whether the claimant held himself out as available for full-time or part-time work. *Carmickle*, 533 F.3d at 1162; *accord Giuliano*, 577 F. App'x at 863-64 (noting that a claimant's statements that she was seeking part-time work may not have been inconsistent with claims of totally disability); *Johnson*, 108 F.3d at 180-81 (applying for unemployment benefits may be evidence, though not conclusive, negating a claim of disability). The Ninth Circuit concluded that holding oneself out as available for full-time work, and receiving unemployment compensation on that basis, was inconsistent with disability allegations. *Carmickle*, 533 F.3d at 1162.

Maestas notes that the requirements for "work" as defined for unemployment compensation may not, in fact, reach the level of substantial gainful activity as determined by the SSA, but this does not mean that the ALJ improperly considered the evidence. While the definition of "work" may not be the same for unemployment and disability purposes, this certification by Maestas can certainly be read to undermine his assertion of disabling symptoms. *See Giuliano*, 577 F. App'x at 863-64; *Carmickle*, 533 F.3d at 1162; *Schmidt*, 395 F.3d at 746; *Johnson*, 108 F.3d at 180-81. Maestas testified that he had been looking for full-time work. (AR

45.) Therefore, the ALJ's inference that this undermines his credibility and is inconsistent with a claim of disability is reasonable. *Carmickle*, 533 F.3d at 1162; *cf. Guiliano*, 577 F. App'x at 863-64.

Next, the ALJ noted two opinions from Dr. Delgado: the May 29, 2011, letter in which Dr. Delgado listed Maestas's medical conditions, and the June 2010 work note, opining that Maestas could return to work after a two-day medical absence. (AR 25-26.) Maestas argues that the fact that Dr. Delgado did not opine on work limitations in the 2011 letter should not have been considered because no one told Dr. Delgado that this information was necessary. (Doc. 21 at 6.) The fact that Maestas's treating physician twice did not place any restrictions on his activities or opine on his disability, in addition to all of the other cited evidence, supports the ALJ's finding that Maestas was not disabled. *See Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995) (finding the ALJ's decision to be supported by substantial evidence when no physician opined that the claimant was disabled, and three physicians opined that the claimant retained some ability to work). The ALJ properly considered that Dr. Delgado's note and his letter were void of any indication that Maestas could not work for an extended period. *Id.*

The ALJ's properly considered the entire case record when evaluating Maestas's credibility and committed no reversible error on this point.

**II.     RFC Determination**

Maestas argues that the ALJ erred in his RFC determination by failing to support the determination with a proper narrative statement and by failing to support the determination with substantial evidence.

Maestas argues that the ALJ failed to meet this requirement because the ALJ had no "basis for finding full range medium work other than the fact that Mr. Maestas' [sic] past work

18

included medium level work." (Doc. 21 at 7.) In support of this argument, Maestas points to the July 27 and November 24, 2010, Function Reports and his hearing testimony to show his functional limitations, particularly related to his legs and eyes. (Doc. 21 at 8.) He complains that the ALJ's decision is brief and lacks the proper narrative discussion to support an RFC determination of medium work. (Doc. 21 at 9.)

SSR 96-8p requires that the ALJ consider each of the seven strength demands separately: sitting, standing, walking, lifting, carrying, pushing, and pulling. 1996 WL 374184, at *5. "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. When the ALJ fails to makes such individualized findings, the decision can be upheld under the harmless error standard when there is substantial evidence supporting the ALJ's findings that the claimant experienced no limitations that would preclude him from the specified level of work. *Ren v. Astrua*, No. 08-CV-01242-LTB, 2009 WL 3497785, at *6 (D. Colo. Oct. 29, 2009) (citing *Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004); *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004); *Murrell v. Shalala*, 43 F.3d 1388, 1389-90 (10th Cir. 1994)).

The ALJ thoroughly reviewed the medical evidence, hearing testimony, and opinion evidence. The ALJ specifically noted that the medical record is brief and "contains no indication that [Maestas] would be reduced to less than medium work activity." (AR 25.) The ALJ also discussed the items of evidence, comparing Maestas's hearing testimony and subjective reports to the medical and opinion evidence, and leading the ALJ to discredit some of Maestas's complaints. (AR 26.) As previously noted, the ALJ is not required to discuss every item of evidence. *Clifton*, 79 F.3d at 1009. Here, the ALJ appropriately linked the evidence in the record

to his findings and supported those findings with substantial evidence. Even though the ALJ did not explicitly lay out limitations on each of the seven functional areas, his decision is supported by substantial evidence and this constitutes harmless error. *See Ren*, 2009 WL 3497785, at *6.

Finally, Maestas argues that because the ALJ gave less weight to the opinions of Drs. Billinghurst and Nickerson, discredited Maestas to the extent his testimony was inconsistent with the RFC, and noted that Dr. Delgado did not list work limitations, the ALJ was left without evidence to support his RFC. This argument lacks merit. Rather than rendering the ALJ without substantial evidence upon which to rest the RFC, the ALJ's discussion of these elements shows that he carefully considered the entire case record and made thoughtful determinations based upon all available information. *See Clifton*, 79 F.3d at 1009.

## CONCLUSION

The ALJ's credibility analysis was appropriately conducted and linked to evidence in the record. The ALJ adequately explained his reasoning and supported the decision with substantial evidence. Furthermore, the ALJ's RFC finding that Maestas could perform the full range of medium work was supported by substantial evidence and a proper narrative discussion. Therefore, I deny Maestas's motion to remand and dismiss this case with prejudice.

IT IS SO ORDERED.

_William P. Lynch_

William P. Lynch
United States Magistrate Judge

20

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.